MRS. A. B. HURT, JOEL HURT, JR., AND CONTINENTAL TRUST COM-
PANY, EXECUTORS, ESTATE OF JOEL HURT, DECEASED, PETITIONERS,
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 28099. Promulgated May 8, 1934.

*William A. Sutherland, Esq.*, and *Elbert P. Tuttle, Esq.*, for the petitioners.

*John H. Pigg, Esq.*, for the respondent.

#### OPINION.

MORRIS: The respondent has determined deficiencies in income taxes of $7,429.49, $14,936.16, and $5,323 for the years 1922, 1923, and 1924 against the above entitled estate and it is for the redetermination thereof that this proceeding is brought.

It is alleged that the respondent erred (a) in disallowing certain deductions claimed by the decedent during the taxable years aforesaid in the defense of a suit brought against him for the recovery of $250,000 and interest, and (b) in disallowing as deductions for 1922 and 1923 amounts claimed on account of an alleged net loss suffered in 1921 upon the bankruptcy of the Pratt Engineering & Machine Co.

The petitioners are the duly appointed and acting executors of the estate of Joel Hurt, deceased.

The decedent, Joel Hurt, was, prior to his death on January 9, 1926, a resident of the city of Atlanta, Georgia. During the years 1918 to 1921, inclusive, the decedent was the majority stockholder and a director of the Pratt Engineering & Machine Co., a Georgia corporation, having acquired his stockholdings in that corporation, amounting to approximately 80 per centum, prior to and/or during the year 1914, at a cost of $229,925.

The Pratt Engineering & Machine Co. was a subcontractor under a United States Government contract with the Everly N. Davis Chemical Corporation. Under the terms of that contract, the Pratt Engineering & Machine Co. received the sum of $250,000 to be used solely in the construction of a picric acid plant at Picron, Arkansas. This money was lost in the operations of the Pratt Engineering & Machine Co., and the corporation was adjudicated a bankrupt in the

654

year 1921. No corporate funds remained after satisfying claims of creditors and bondholders. During the year 1922 the United States Government instituted suit in the District Court of the United States for the Southern District of New York against the decedent and the other directors of the Pratt Engineering & Machine Co., seeking to recover from them, individually, the sum of $250,000, plus interest, on the ground that the aforesaid sum of $250,000 had been misappropriated, and that the directors of the corporation were, therefore, liable under the trust fund doctrine. This suit was discontinued by stipulation and consent of counsel, on January 11, 1926, without prejudice.

In connection with the litigation as set forth above the decedent paid attorney fees and court costs, as follows: $2,364.65 in the year 1922; $13,124.82 in the year 1923; and $7,023.99 in the year 1924. In the income tax returns filed by the decedent for the years 1922, 1923, and 1924, the aforesaid amounts were claimed as deductions from gross income for the years in which paid. In his determination of the deficiencies involved in this proceeding, the respondent disallowed the deductions so claimed, on the ground that they did not represent ordinary and necessary business expenses within the meaning of section 214 (a) (1) of the Revenue Acts of 1921 and 1924.

The stock of the Pratt Engineering & Machine Co., which the decedent acquired at a cost of $229,925, as above set forth, became worthless during the year 1921. The decedent's net income for the year 1921, computed without any deduction for or on account of the loss sustained by him by reason of his stock in the Pratt Engineering & Machine Co. having become worthless in that year, was $48,395.92. The excess of the loss so sustained by the decedent over the income so received by him in 1921 is $181,529.08.

The income tax returns filed by the decedent for the years 1922 and 1923 disclosed no tax due, by reason of the fact that deductions were claimed on each of said returns for a portion of the aforesaid amount of $181,529.08. These deductions were claimed by the decedent on the ground that the loss sustained by him by reason of his stock in the Pratt Engineering & Machine Co. having become worthless in the year 1921 was a net loss within the meaning of section 204 of the Revenue Act of 1921 and section 206 of the Revenue Act of 1924. In his determination of the deficiencies involved in this proceeding for the years 1922 and 1923, the respondent disallowed the deductions so claimed. The decedent's net income for the year 1922, computed without any deduction for or on account of the attorney fees herein involved, and without any deduction for or on account of the loss sustained in connection with the stock of the Pratt Engineering & Machine Co., is $57,098.40. His net income for the year 1923, computed in like manner, is $87,131.22.

In addition to the foregoing stipulated facts the parties reduced to writing what the testimony of the son of the decedent would have been had he been called to testify regarding his father's business career. In the beginning, many years ago, he was engaged in the real estate business, operating under a partnership form. It was at or about that time that he organized the first building and loan association known to that section of the country. In or about 1882 he was instrumental in organizing one of the first fire insurance companies to be organized in the South, he becoming secretary of the company, in which capacity he continued until about 1900, when he acquired the controlling interest and became its president. In or about 1915 that company was sold to another and the stockholders thereof received stock of the new company in exchange for their holdings in the old.

What was probably his largest undertaking was the organization of a company in 1887 for the development and sale of real estate and the promotion of a street railway. He became the president of the company and owned $500,000 of the total $600,000 capitalization of the company. Having sold practically all of its land prior to 1912, the company ceased to be active. It successfully developed a large subdivision and built the first electric street railway in Atlanta.

At the time of the organization of the street railway just referred to there were several separate horse-car lines operating on the streets of Atlanta, being owned by different companies. Shortly thereafter one or two other small electric lines were started. Just prior to 1900 the decedent consolidated practically all of the street railway lines in the city of Atlanta and in or about 1902 he disposed of his holdings in that enterprise.

The same company just referred to built in 1890 what was then regarded as the largest office building in the South, which within a few years thereafter was sold to another company.

In 1891 the decedent purchased all, or at least 80 percent, of the stock of a savings bank then enjoying an exceptionally advantageous charter. The capital stock of that institution was gradually increased and finally the decedent disposed of his holdings, retiring from the presidency thereof in or about 1904.

The decedent reorganized a company engaged in the iron and coal mining business in 1901, acquiring 3,705 of the 4,000 outstanding shares thereof. The assets of that company were sold in 1906 to another corporation and finally, by virtue of the ownership of mortgage bonds upon those properties, and the foreclosure thereupon, they were repossessed by the decedent and later sold to another corporation.

In 1890 the decedent organized another company, of which he was vice president, for the purpose of developing and selling real estate.

Finally, in 1908, he having then acquired control thereof, all of the company's properties were sold to other interests.

In 1909 the decedent built a theatre building costing approximately $150,000, which he leased to others and finally sold in 1924 to a realty corporation.

The corporation known as the Atlanta Realty Corporation was organized in 1912 for the purpose of erecting a modern office building, one of the three largest in the country. The $1,000,000 capital of the company was paid for with real estate and was owned entirely by the decedent and his wife. The stock in that company was partially disposed of by gift by the decedent before his death.

In or about 1911 the Pratt Engineering & Machine Co., which the decedent owned, contracted with another corporation to erect an acid and fertilizer plant. The plant was completed by the Pratt Co., but the other party to the contract defaulted in payment, so that the Pratt Co. was compelled to take over the plant. In the solution of this difficulty the decedent advanced the funds with which to organize a fertilizer company in order to place the plant in operation. For the duration of the war the company made handsome profits, but had not succeeded in earning sufficient to restore the capital investment therein prior to the time when the war ended and business was no longer profitable. The decedent owned the stock in that company until his death.

In 1913 the decedent and others organized a trust company and he was elected vice president thereof and continued to occupy that office until 1926. That company was capitalized at $500,000, 2,372 shares of its stock being then owned by the decedent, which he later increased to majority ownership.

In or about 1915 the Commercial National Bank of Macon became financially embarrassed and was closed by the Comptroller of the Treasury, the assets of which were later bought by the American National Bank, which latter institution liquidated. The decedent purchased all of the assets of the American National, including $1,500,000 of the assets of the Commercial National, and he agreed to pay all of the debts of the American National, together with $150 a share to the stockholders. He acted as liquidating agent, collected all of the assets that were collectible, and was discharged in 1925. One of the assets of the American National was a 6,253-acre farm, an historic plantation near Macon. The decedent decided to organize that farm as a model agricultural institution and he built a nine-mile levee to protect it from floods. He spent substantial amounts on the development of the property, which he still owned at the time of his death.

Petitioner's first claim relates to the deductibility of attorney fees paid by the decedent in the defense of a lawsuit brought against him and other directors of the Pratt Engineering & Machine Co.

We have consistently held since *Sarah Backer*, 1 B.T.A. 214, that where a suit is directly connected with or results " proximately " from a taxpayer's trade or business, attorney fees and costs incurred therein are deductible as ordinary and necessary business expenses under the statute. The rule adopted in that case was approved in *Kornhauser* v. *United States*, 276 U.S. 145, and has since been followed in innumerable other cases. The Court in that case, reviewing certain departmental and Board rulings, spoke with approval of the allowance of a deduction of legal fees incurred by a physician in the defense of a suit for malpractice, the deductibility of similar expenses incurred in defending an action for damages by a tenant injured upon the taxpayer's farm, and fees expended in the defense of a patent infringement suit. Speaking of legal fees being " ordinary and necessary ", the Court said " it was an ' ordinary and necessary ' expense, since a suit ordinarily and, as a general thing at least, necessarily requires the employment of counsel and payment of his charges."

In *Peoples-Pittsburgh Trust Co. et al., Executors*, 21 B.T.A. 588; affd., 60 Fed. (2d) 187, the decedent had been the chairman of the board of directors of the Crucible Steel Co. of America and as the executive head of that company he swore to its returns for 1917 and 1918, which, upon examination by the department, were alleged to have been fraudulently prepared and criminal charges were preferred against the decedent. A true bill was returned against him and another officer of the company charging conspiracy to defraud the Government of taxes. Upon trial he was acquitted. In holding that the legal and accounting fees incurred in connection with that proceeding were deductible as ordinary and necessary business expenses, we said that " the necessity of paying out that sum of money was occasioned by acts done by DuPuy in connection with his trade or business that were directly related thereto." The Board there pointed out the distinction between purely personal acts, as such, done while engaged in a trade or business, for which one may be required to respond personally in damages, and those acts which are integrally a part of and proximately result from the business.

The foregoing case is, of course, distinguishable upon the facts from the instant case, for the reason that there criminal charges were involved instead of a civil suit as here. However, the Board did not concern itself with the criminal aspects of the proceeding, but merely sought to determine whether the deduction sought was

one ordinarily found and necessarily incurred in the decedent's trade or business, and, finding that it was, the deduction was allowed. Indeed it matters not whether the fees were paid in the defense of a civil or a criminal action if the payment thereof comes within the purview of the statute as interpreted by the many cases concerning the subject matter, *Citron-Byer Co.*, 21 B.T.A. 308.

Here, as in *Peoples-Pittsburgh Trust Co.*, *supra*, the decedent was an executive of a corporation and was charged with the commission of acts performed by him for the corporation giving rise to court proceedings against him, which necessitated the payment of fees for the retention of counsel. Clearly, the acts complained of were in the performance of the decedent's business and it naturally follows that the expenses so incurred resulted proximately from that business and we hold, therefore, that the deduction should be allowed. Cf. *Fred T. Ley*, 21 B.T.A. 216.

The other allegation of error urged by the petitioner relates to the disallowance of a certain alleged net loss in 1921, sustained in the bankruptcy of Pratt Engineering & Machine Co., which the petitioners seek to bring forward to the taxable years 1922 and 1923.

The circumstances surrounding this question, as the petitioners' counsel frankly concedes, are very similar to those which obtain in *Ida A. Van Dyke*, 23 B.T.A. 946; affirmed by the Circuit Court at 63 Fed. (2d) 1020; and by the Supreme Court, *per curiam*, 291 U.S. 642. In that case Van Dyke's activities over a period of years involved the development and promotion of town sites, particularly public utilities. There, as here, Van Dyke's activities began with the purchase and sale of real estate. Thereafter he engaged in many other activities such as the development of utility companies, to which he advanced funds, the construction of street railways, lighting systems, sewerage and water systems, and in the promotion and development of a newspaper and certain other mining ventures. Finally Van Dyke advanced a sum of money to one of his corporate interests owning a large tract of land in Florida, he being interested in the town site possibilities there and in the development of public utilities to serve such towns, and for such funds he received stock in the enterprise, thereafter devoting considerable time to its affairs. The enterprise was a failure, foreclosure proceedings were brought, and Van Dyke sustained a loss for 1922 which he sought to bring forward to the succeeding years in the reduction of his taxable net income. The respondent denied such deductions and the Board sustained him and was itself affirmed upon appeal.

While the decedent was an extremely active man and while his activities appeared to be even more voluminous than were Van

Dyke's in the foregoing proceedings, upon the essential facts the two cases are practically indistinguishable and in principle there is no distinction. See also *Burnet* v. *Clark*, 287 U.S. 410, and *Dalton* v. *Bowers*, 287 U.S. 404.

*Decision will be entered under Rule 50.*