GENERAL OUTDOOR ADVERTISING COMPANY, INC., PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66511.    Promulgated July 25, 1935.

*James L. Dohr, Esq.,* and *Malcolm C. Law, Esq.,* for the petitioner.

*Harry F. Morton, Esq.,* for the respondent.

1012

1014

OPINION.

SMITH: 1. The first question presented by this proceeding is whether petitioner is entitled to deduct from its gross income of 1929, $199,-222.34 paid out for attorney fees and other expenses in connection with an equity suit instituted by the United States against the petitioner and others under the Sherman Anti-Trust and Clayton Acts which resulted in the entry of a consent decree. Petitioner claims the right to the deduction under section 23 of the Revenue Act of 1928, which, so far as material, provides:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) *Expenses.*—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

In the litigation referred to the United States made the following substantial charges against the petitioner:

(a) that petitioner was part of a combination and conspiracy to restrain interstate trade and commerce, and to monopolize and attempt to monopolize such commerce; (b) that petitioner itself was an illegal combination and unlawful monopoly and that it should be dissolved; (c) that contract of August 24, 1925 between petitioner and National Outdoor Advertising Bureau, Inc., was illegal; (d) that options to purchase stock of the National Outdoor Advertising Bureau, Inc., were illegal; (e) that petitioner violated the law in entering into contracts for outdoor advertising display to be executed on plants owned by others; (f) that National Outdoor Advertising Bureau, Inc., granted preferences, priorities, etc., to petitioner; (g) that petitioner granted preferences, priorities, etc., to the National Outdoor Advertising Bureau; (h) that petitioner illegally refused to sell advertising space; (i) that petitioner and Foster & Kleiser Company had an illegal understanding as to the division of territory between them; (j) that petitioner and others maintained illegal price agreements; (k) that election of George W. Kleiser to petitioner's Board of Directors was illegal; (l)

that Foster & Kleiser Investment Company was part of an illegal community of interest between Foster & Kleiser Company and petitioner; (m) that voting trust agreement of February 26, 1925, under which petitioner's stock was trusteed, was illegal; (n) that petitioner's contract for the acquisition of P. & H. Morton Advertising Company was illegal; and (o) that Outdoor Advertising Association of America was part of an illegal monopoly.

Before the suit was instituted representatives of the petitioner and of the United States Department of Justice had had many conferences with respect to the application to it of the Sherman Anti-Trust and Clayton Acts. The petitioner was willing to agree that under the construction placed upon those acts by the Department of Justice certain of its contracts were illegal; also that the court might enter a decree that the petitioner be enjoined from doing certain things provided for in the contracts. It was not, however, willing to admit that all of the charges made against it by the Department of Justice were well grounded—hence, the suit. Voluminous testimony was taken in the trial of the case. While the case was on hearing counsel for the United States and for the petitioner agreed to the entry of a consent decree, which was later entered by the court. Many of the charges made by the United States, particularly the serious charges, were not established by the decree. The decree established, however, that the contract of August 24, 1925, between the petitioner and the National Outdoor Advertising Bureau, Inc., was illegal. The petition in the proceeding charged with respect to this contract:

* * * Under this contract, which is now in full force and effect, the Bureau was constituted the agent of the General Company [petitioner] to solicit contracts for national outdoor advertising to be executed upon the plants owned or operated by the General Company, and, at the option of the Bureau, to be executed upon plants not owned or operated by the General Company. The contract further provides that all advertising contracts procured or obtained by the Bureau to be performed by the General Company shall forthwith be assigned by the Bureau to the General Company. In the practical operation of this contract more than 90 per cent of all of the contract for outdoor advertising obtained by the Bureau are assigned to the General Company.

In addition, the General Company and the Bureau have agreed in this contract not to compete in the solicitation of national advertising from specified advertisers, the names of which are appended to the contract, but which are changed from time to time by mutual agreement between the General Company and the Bureau.

With the exception of the General Company itself, the Bureau (including so-called members thereof) is the largest single agency in the United States for the solicitation of national outdoor advertising. The combined volume of business obtained by the General Company and the Bureau represents about 80 per cent of the total volume of national outdoor advertising business in the United States.

The contract between the General Company and the Bureau is now in operation and will continue for an indefinite period by virtue of the provision therein for automatic renewal until cancelled by written notice, and even on the giving of such written notice the contract shall not terminate until five years from the end of the year in which notice of a desire to terminate is given.

The parties were enjoined from further carrying out this agreement or any similar agreement, except that operations under it might be continued until November 1, 1929, for the purpose of making necessary changes and adjustments in the business operations of the parties incident to the voiding of the contract. Options to purchase stock of the National Outdoor Advertising Bureau, Inc., were declared null and void. The election of George W. Kleiser as a member of the board of directors of the petitioner was declared in violation of the Clayton Act and Kleiser was perpetually enjoined from holding that office. The decree also provided that certain acts, if performed, would be in violation of the law and petitioner was enjoined from doing any such acts.

The petitioner contends that the greater part of the far-flung charges made against it by the United States were not substantiated; that as a result of the litigation the petitioner was not required to refrain from doing anything which it had not agreed to refrain from doing prior to the entry of the consent decree; that it was necessary for the petitioner to defend itself from the grave charges made against it by the United States; and that the attorney fees and expenses paid in connection with the litigation were ordinary and necessary expenses within the contemplation of the taxing statute.

The question of what constitutes ordinary and necessary expenses was before the Supreme Court in *Welch* v. *Helvering*, 290 U. S. 111. The Court there said:

* * * Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. *Kornhauser* v. *United States*, 276 U. S. 145, 48 S. Ct. 219, 72 L. Ed. 505. * * *

In *Mrs. A. B. Hurt et al., Executors*, 30 B. T. A. 653, we stated:

We have consistently held since *Sarah Backer*, 1 B. T. A. 214, that where a suit is directly connected with or results "proximately" from a taxpayer's trade or business, attorney fees and costs incurred therein are deductible as ordinary and necessary business expenses under the statute. The rule adopted in that case was approved in *Kornhauser* v. *United States*, 276 U. S. 145, and has since been followed in innumerable other cases. The Court in that case, reviewing certain departmental and Board rulings, spoke with approval of the allowance of a deduction of legal fees incurred by a physician in the defense of a suit for malpractice, the deductibility of similar expenses incurred in defending an action for damages by a tenant injured upon the taxpayer's farm, and fees expended in the defense of a patent infringement suit. Speaking of legal

fees being "ordinary and necessary," the Court said "it was an 'ordinary and necessary' expense, since a suit ordinarily and, as a general thing at least, necessarily requires the employment of counsel and payment of his charges."

In *Commissioner* v. *Continental Screen Co.*, 58 Fed. (2d) 625; affirming 19 B. T. A. 1095, the question before the court was whether attorney fees paid by a corporation for services in representing the corporation before the Federal Trade Commission were legally deductible from gross income as ordinary and necessary expenses. The court held that they were. It stated:

\* \* \* we have no doubt as to the correctness of the board's decision. The proceeding before the Trade Commission was undoubtedly an "action" against respondent which was "directly connected with" or which "proximately resulted" from its business. To respondent's board of directors the situation was ominous. The life of the business was endangered. Under such circumstances respondent followed the very natural and ordinary procedure suggested by the vital necessity of the situation. It employed counsel to protect its interest and agreed to pay for their services. Any other course upon the part of its board of directors would have been unusual and would, no doubt, have subjected them to well founded criticism by its stockholders.

In *Foss* v. *Commissioner*, 75 Fed. (2d) 326, the question was as to whether Foss, a stockholder in two corporations, was entitled to deduct from gross income certain counsel fees. Minority stockholders in one of the companies filed a bill in equity against Foss in the Federal Court in New Jersey alleging that he and certain others were in combination to waste the assets of the company and divert its business to another company and to violate the Sherman Anti-Trust Act. The District Court found in favor of the plaintiffs; it enjoined Foss and his associates from doing the illegal acts specified and also in voting their stock in the Blower Co. On appeal the Circuit Court of Appeals for the Second Circuit vacated the last part of the order and allowed Foss and his associates to vote their stock. Foss paid his personal counsel for services in this litigation $5,000 in 1920, and $32,479 in 1921. He contended that these payments were proper deductions from his gross income in those years. The Commissioner refused to allow them. In the course of its opinion the Circuit Court of Appeals for the First Circuit stated:

We entertain no doubt that the counsel fees in question were an ordinary and necessary expense of that business. The test is stated in *Kornhauser* v. *United States*, 276 U. S. 145, in which it was said, "Where a suit or action against a taxpayer is directly connected with or, as otherwise stated, proximately resulted from his business, the expense incurred is a business expense," etc. Sutherland, J., at page 153. The litigation was plainly an outgrowth of the business activities in which Foss was engaged. He was brought into the suit, not as the government contends, simply because of his stock ownership in the Blower Co., but because of his stock ownership and business activity in the Sturtevant Co. *and* the Blower Co. It was his business activities in

those connections which exposed him to the suit. Under such circumstances counsel fees are a deductible expense as was expressly held in the *Kornhauser* case. See, too, *Commissioner* v. *Continental Screen Co.*, 58 Fed. (2d) 625 (C. C. A. 6) ; *Commissioner* v. *People's Pittsburgh Trust Co.*, 60 Fed. (2d) 187.

In support of his disallowance of the expenses here in question the respondent relies upon *Burroughs Building Material Co.*, 18 B. T. A. 101; affd., 47 Fed. (2d) 178; *Gould Paper Co.*, 26 B. T. A. 560; affd., 72 Fed. (2d) 698. In the first mentioned case the court held that the counsel fees paid by a taxpayer in defense of prosecution for violation of a price-fixing statute were not deductible as ordinary and necessary expenses. In *Gould Paper Co.* v. *Commissioner, supra*, the court said:

> The cost of defending the proceedings against the petitioner and its president in 1917 are deductible, if at all, because they were ordinary and necessary expenses of the petitioner's business. Part of these expenses were incurred in defending a criminal action against the president and part in defending both the petitioner and its president in an action in equity. The effect of membership in an organization known as the News Print Manufacturers Association was a part of the issue. We considered at some length the question here presented in *Burroughs Bldg. Material Co.* v. *Commissioner*, 47 Fed. (2) 178, and reached the conclusion that a taxpayer could not deduct such expenses as these when incurred in its own behalf. As to the part expended in behalf of its president the petitioner has even less reason to claim a deduction.

The petitioner seeks to distinguish the present proceeding from the above mentioned cases upon the ground that in *Burroughs Building Material Co.* v. *Commissioner, supra*, the question was as to whether fines, court costs, and attorney fees in connection with an indictment under a state statute prohibiting price-fixing agreements where the taxpayer pleaded guilty were deductible from gross income. The petitioner submits that there is no such issue in this case. Petitioner further submits that in the *Gould Paper Co.* case there was, first of all, a criminal proceeding, and, second, that the taxpayer was adjudged as having participated in an unlawful combination in restraint of trade, whereas there are no such facts which obtain in this case.

We are of opinion that the distinction sought to be made is a valid one. The suit brought against this petitioner by the Department of Justice quite clearly had as its objective the development of a series of rules for the government of the industry. The petitioner was of the opinion that it was not violating the Sherman Anti-Trust and Clayton Acts by anything it did. In fact it claimed that those acts did not apply to it. The court did not find that the petitioner had participated in an unlawful combination in restraint of trade in violation of the Sherman Anti-Trust Act. The consent decree stated that a certain agreement which the petitioner

had entered into with another corporation was illegal and the petitioner was enjoined from further operating under the agreement, except for a season. The decree also set forth that certain acts would, *if performed*, violate the law and such acts were enjoined, but there is no finding that the acts were committed.

It is not lightly to be assumed that Congress intended to exclude from ordinary and necessary expenses of operation attorney fees paid in the regular course of business. The Board and the courts have held, in many instances, that taxpayers may not deduct, as ordinary and necessary expenses, fines and the costs of litigation where the taxpayer has been found guilty of violating laws. But the reason for the disallowance of such deductions has generally rested upon the ground that they were not proximately connected with the taxpayer's business, or that to allow the deductions would be against public policy. Neither of such reasons obtains in this case.

In our judgment the $199,222.34 paid or accrued by the petitioner upon its books of account in 1929 is a legal deduction from gross income as an ordinary and necessary expense.

2. and 3. The respondent in his deficiency notice held that the General Outdoor Managers Securities Corporation was affiliated with the petitioner during the year 1929 within the purview of section 141 of the Revenue Act of 1928, and that its net loss of $197.85 for 1929 should have been included in the consolidated return filed by the petitioner. He disallowed a deduction in the sum of $68,100 actually paid by the petitioner and claimed to have been incurred by it as additional compensation for its managers and executives. The petitioner contends that the amount which should have been deducted is $70,200, since that was the amount which it had obligated itself to pay to the General Outdoor Managers Securities Corporation for 4,680 shares of that corporation's capital stock. The two questions, first, as to affiliation status, and, second, as to the deductibility of the $70,200, will be considered together.

Section 141 (d) of the Revenue Act of 1928 defines an " affiliated group " to be:

* * * one or more chains of corporations connected through stock ownership with a common parent corporation if—

(1) At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations; and

(2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations. * * *

Article 713 of Regulations 74 requires that "A consolidated return must include every domestic corporation which is a member of the affiliated group."

The respondent argues that since under the plan for the organization of the General Outdoor Managers Securities Corporation the petitioner was to subscribe and pay for 5,000 shares of stock of that company at $40 per share, which shares were to remain the sole property of the petitioner, and since from the date of organization of the corporation in April 1929 to December 31, 1929, the petitioner was the legal owner of all of the outstanding shares of the General Outdoor Managers Securities Corporation, the two corporations were affiliated during the period in question.

The petitioner contends that there was no affiliation between General Outdoor Advertising Co. and General Outdoor Managers Securities Corporation, upon the ground that the shares of stock of the latter corporation were not beneficially owned by the petitioner, but by the participants in the plan, citing *Handy & Harmon* v. *Burnet*, 284 U. S. 136. We are of the opinion, however, that the principle invoked by the Supreme Court in *Handy & Harmon* v. *Burnet* is not applicable here. Under the agreement between the petitioner and the General Outdoor Managers Securities Corporation the shares of the latter company subscribed for and paid by the petitioner were to " remain its sole property." Also, under the plan, if the employment of the participant was terminated for cause resulting in loss to the petitioner, the participant was to receive such sum as might be fixed by petitioner's board of directors at not less than $25 per share.

We are furthermore of the opinion that the payment of the $70,200 in question by the petitioner in 1929 was not intended as additional compensation paid for the services of its managers and executives. The corporation was organized with other objects in view. We sustain the respondent's disallowance of the claimed deduction. Cf. *S. Naitove & Co.*, 8 B. T. A. 589, 596; affd., 32 Fed. (2d) 948; *Horn & Hardart Baking Co.*, 19 B. T. A. 704.

4. The last question in issue is whether the respondent erred in determining and computing a taxable gain of $532,140.60 on the transfer by the petitioner in 1929 of certain of its assets to the Central Outdoor Advertising Co. for stock in that company.

Section 112 of the Revenue Act of 1928 provides, so far as material, as follows:

(b) *Exchanges solely in kind.—*

\*          \*          \*          \*          \*          \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by

each is substantially in proportion to his interest in the property prior to the exchange.

\*  \*  \*  \*  \*  \*  \*

(j) *Definition of control.*—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

The evidence shows that the four transferor corporations were "in control" of the Central Outdoor Advertising Co. immediately after the exchange because they owned 80 percent of all the stock issued by the Central Outdoor Advertising Co. The question raised by the respondent is whether the stock of the new company was issued substantially in proportion to the interest of each corporation in the property prior to the exchange. He submits that the figures set up on the books of the new corporation show the net value of the assets (assets less liabilities) transferred to the Central Outdoor Advertising Co. by the respective companies, and that based upon these book values the percentages of the interest of each company in the property transferred, prior to the exchange, and the percentages of the stock received by each of the companies are as follows:

| Company | Shares received | Percent of total shares issued in exchange | Net value of assets transferred | Percent of interest in property |
|---|---|---|---|---|
| | | *Percent* | | *Percent* |
| General Outdoor | 46,000 | 46 | $711,209.71 | 55 |
| H. H. Packer Co | 44,000 | 44 | 474,933.93 | 37 |
| Bond Co | 690½ | 00.7 | 21,700.65 | 1.7 |
| Toledo Poster Co | 9,309½ | 9.3 | 80,240.85 | 6.3 |
| Total | 100,000 | 100 | 1,288,085.14 | 100 |

The respondent submits that from the foregoing table it can readily be seen that there were considerable discrepancies in the ratio of stock issued to the interest of each recipient in the property exchanged; that the petitioner received 9 percent less stock of the total issued than its interest in the property transferred; that the Packer Co. received 7 percent more stock than the value of its assets entitled it to; and that the Bond Co. and Toledo Co. together received 2 percent of the stock in excess of their contribution of assets. The respondent further submits that the fair market value of the shares of Central Outdoor Advertising Co. at the date of receipt by the transferors was $30 per share, instead of $16.30 per share as claimed by the petitioner.

The evidence shows that the allocation of the stock was made to the transferor corporations in exact proportion to the values placed upon the assets conveyed by the several transferor corporations; that the persons who were responsible for the determination of the

amounts of the stock to be issued were thoroughly conversant with the properties to be conveyed to the new corporation; that they took all of these factors into account in making the allocation; and that the allocation of the shares of stock to them was mutually satisfactory. The evidence further shows that thereafter accountants were employed to determine the values of the assets received from the several corporations for the purpose of making entries upon the books of account of the new corporation. We have set forth in our findings the basis which the accountants used. That basis was in no wise related to the basis used by the several transferor corporations in their negotiations for the determination of the amount of stock to be issued to each by the Central Outdoor Advertising Co.

From a consideration of the entire evidence we are of opinion that the respondent's contention upon this point is without merit. Cf. *Ared Corporation*, 30 B. T. A. 1080. The amount of the stock and securities received by each of the transferor corporations was substantially in proportion to its interest in the property prior to the exchange. The petitioner realized no taxable gain from the exchange. The contention of the petitioner upon this point is sustained.

In view of the conclusion which we have reached upon this point, it is not necessary to determine the fair market value of the shares of Central Outdoor Advertising Co. at the date of receipt by the petitioner.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

McMAHON, concurring: The cases cited by the Board (and *Citron-Byer Co.*, 21 B. T. A. 308; *Peoples-Pittsburgh Trust Co., et al., Executors*, 21 B. T. A. 588; affirmed in *Commissioner* v. *Peoples-Pittsburgh Trust Co.*, 60 Fed. (2d) 187; and *Lawrence A. Wagner*, 30 B. T. A. 1099, and cases therein cited) disclose that in a proceeding before the Board, where it appears from a conviction in a criminal court or from an adjudication with a finding in a civil court, or from undisputed proof which would justify such a conviction or finding, that acts in contravention of laws subjecting offenders thereunder to fine, imprisonment, or both, or to restraining orders of a tribunal of competent jurisdiction, have been committed in the operation of a business, expenses incurred or paid in a defense against formal complaints or charges before or by a court or governmental agency of competent jurisdiction based on such acts are not allowable as deductions because such allowance would be contrary to sound public policy; and, on the other hand, where such conviction, finding or undisputed proof is not established, deductions of this character are allowable. No such conviction, finding or undisputed proof has been established in this proceeding.

Turner, dissenting: I am unable to agree with the conclusion reached in the majority opinion in respect of the deduction claimed for attorney fees. The facts show that they were paid for legal services rendered in the defense of certain acts of the petitioner which were admitted in a consent decree to have been illegal, and, in my opinion, the rule laid down in *Burroughs Building Material Co.* v. *Commissioner*, 47 Fed. (2d) 178, should be applied.

Van Fossan and Seawell agree with this dissent.