Parkwood Corporation v. Commissioner.
Parkwood Corp. v. Commissioner
Docket No. 19154.
United States Tax Court
1950 Tax Ct. Memo LEXIS 106; 9 T.C.M. (CCH) 748; T.C.M. (RIA) 50215; September 7, 1950
*106 In 1937 petitioner issued 50 shares of its stock to A in exchange for $5,000 in cash, 90 shares of its stock to B and B's associates in exchange for $9,000 in cash, and 250 shares of its stock to C in exchange for a license expiring in 1973. In 1942 petitioner canceled the license pursuant to an option therein. The fair market value of the license determined to be $25,000 and acquired by petitioner in a non-taxable exchange under section 112 (b) (5) of the Internal Revenue Code. Petitioner's basis for computing the loss sustained upon cancellation of the license in 1942 and its basis for determining the amount upon which the license was includible in equity invested capital under section 718 (a) (2), held the cost basis of the transferor. Section 113 (a) (8) of the Internal Revenue Code. David Burstein, Esq., for the petitioner. Melvin L. Sears, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent has determined a deficiency in excess profits tax for the taxable year ended December 31, 1943, in the amount of $21,203.11. The principal question presented is whether a license agreement transferred to the petitioner on January 23, 1937, in exchange for stock was acquired by the petitioner in a tax-free exchange within the meaning of section 112 (b) (5), requiring the petitioner, under section 113 (a) (8), to use the transferor's cost basis in computing the amount of the loss sustained in 1942 upon the cancellation of the license. In the event it is determined herein that the license agreement was not acquired by the petitioner incident to a tax-free exchange under section 112 (b) (5), secondary questions arise concerning the cost basis to be used by the petitioner in computing the loss sustained upon the cancellation of the license agreement in 1942 and the amount at which the license agreement is includible *108 in the petitioner's equity invested capital under section 718 (a) (2) of the Internal Revenue Code. The proceeding was submitted upon pleadings, testimony, and stipulations of facts with attached exhibits. The stipulations have been incorporated in material part into our findings of fact. Findings of Fact Petitioner was organized as a Massachusetts corporation on November 18, 1936. Its income and excess profits tax returns for the calendar year 1943 were filed with the collector of internal revenue for the district of Massachusetts. Mary Stewart Parker, hereinafter referred to as Mrs. Parker, had extensive training and experience in the manufacture of wood veneers. Gordon Parker, her husband, throughout his business career had also been actively engaged in the wood veneer business. Early in the summer of 1936, Mrs. Parker collaborated with Harry N. Atwood, the holder of a number of patents and inventions relating to the manufacture of materials from woven wood veneers treated with plastics, and assisted him in the development of such materials. On November 10, 1936, Atwood and Mrs. Parker executed an agreement whereby Mrs. Parker was granted a license *109 from Atwood to manufacture panel materials covered by the Atwood processes and patents, and including patents then pending of this nature or thereafter developed by Atwood. Under this agreement, which expired November 10, 1973, Atwood was to receive the royalties from all panel stock sold by Parker of six per cent of net sales in 1937, the royalties percentage decreasing by one per cent each year until 1942, in which year it was to be one per cent of net sales for that year and each year thereafter until expiration of the license. It was further provided that the above cash royalties were to be not less than $400 per month, Mrs. Parker agreeing to pay this minimum monthly sum for the duration of the license period. The license was subject to cancellation by the licensee on six months' notice. It was understood by the parties that the license would be assigned by Mrs. Parker to a corporation to be organized for the manufacture of panel stock. The cost to Mrs. Parker of acquiring the license agreement from Atwood was $1,800. The Atwood patents, which were regarded as being basic in nature, covered the process of treating wood veneer on both sides with plastic, the cutting of the veneer *110 into strips, the weaving of the strips, and the pressing of the woven material into a smooth, flexible panel possessing an unusually attractive finish. The result was that panels made under the Atwood process combined the strength and other natural advantages of wood with flexibility previously unknown to wood products. These features were regarded as having particular application and promise in the field of aviation and in the manufacture of decorative and novelty items. U.S. patent No. 2126711, the result of Atwood's development of work in collaboration with Mrs. Parker in 1936, was issued in 1938. Gordon and Mrs. Parker organized petitioner for the purpose of exploiting the above license, believing that the Atwood inventions had great commercial possibilities. At the time of petitioner's organization Gordon Parker paid $5,000 in cash to the petitioner as the subscription price of 50 shares of its stock which were issued to him on January 28, 1937. In connection with raising funds to finance the business, the Parkers conferred with Lucius E. Thayer, an attorney and personal friend. Thayer helped organize petitioner and was a director therein. Thayer investigated the development *111 possibilities of the license by conferring with Atwood, Atwood's patent attorney, and a plastics engineer. Thayer told the Parkers that he believed the license held by Mrs. Parker to be worth at least $50,000, but that the price of obtaining venture capital to finance a corporation to exploit the license would be the control of the corporation. Mrs. Parker stated to Thayer that she desired to retain control of the corporation that would develop the license and that in view of the importance of such control she would be willing to transfer the license to petitioner for one-half of the value stated by Thayer. Thayer agreed that on such a basis he and several of his associates would be willing to invest $9,000 in the petitioner. The minutes of the meeting of petitioner's board of directors held on January 23, 1937, read in part as follows: "Mrs. Parker stated that she is the holder of a license from Harry N. Atwood to make and sell basic plactic materials, and that she will assign the license to the corporation in consideration of the issue to her of 250 shares of its stock. "Upon motion duly made and seconded, it was VOTED: That upon receipt from Mrs. Parker of a properly executed *112 assignment of the license from Harry N. Atwood to her to make and sell basic plastic materials, the proper officers are authorized and instructed to issue to her a certificate or certificates for 250 shares of stock." Mrs. Parker reported no gain or loss in her income tax returns for 1936 or 1937 from the transaction whereby she assigned the license agreement to the petitioner. On January 28, 1937, petitioner issued a stock certificate for 250 shares of its common stock to Mrs. Parker in exchange for the license which she had assigned to it. The fair market value of such stock at the time of its issuance to Mrs. Parker was $25,000. Stock certificates for original issues of stock were thereafter issued by the petitioner to Thayer and his associates for cash at $100 per share. All stock issued by the petitioner was no par common stock. The license was carried on the petitioner's books at a value of $25,000. No credit was made to paid-in surplus in connection with the acquisition of the license. Petitioner listed the license on its income tax returns for the years 1938 to 1942, inclusive, at a value of $25,000. In 1938 petitioner effected a four for one stock split-up. New shares *113 thereafter issued for cash were at the rate of $100 per share. Petitioner's relations with Atwood were not harmonious. Atwood subsequently conveyed the Canadian rights covered by Mrs. Parker's license to another party and at one time threatened to sue the petitioner if panel materials were sold to aircraft manufacturers without a license from him. On another occasion, Atwood threatened to bring suit for fraud. Because of these difficulties and the problem of obtaining plastics during the war for non-essential uses, petitioner canceled the license by notice dated June 29, 1942, to be effective December 31, 1942. Petitioner paid to Atwood the $400 minimum monthly royalty from January 1, 1937 through December 31, 1942. Petitioner's gross sales, as disclosed on its income tax returns, were in the following amounts: 1937 $0
1938
6,148.20
1939
29,082.76
1940
73,231.66
1941
116,278.87
1942
122,534.07
On its 1942 income and excess profits tax returns, petitioner claimed a loss from the cancellation of the license in the amount of $21,527.78. Petitioner computed its excess profits tax credit on the invested capital method. In the notice of deficiency, the loss *114 of $21,527.78 claimed by the petitioner in its 1942 tax return was treated as follows in computing petitioner's net operating loss deduction for the taxable year 1943: "The deduction of $21,527.78 claimed as license expense represents write-off of 31/36 of original cost of $25,000.00 set up as basis of license agreement transferred on January 28, 1937 to your corporation by Mary C. Parker upon issuance to her of 250 shares of your stock at an agreed value of $25,000. The license agreement was cancelled in 1942. * * *
"It is the opinion of this office that the transaction comes within the provisions of section 112 (b) (5) of the Code, since the basis of the property to your corporation shall be the same as it would be in the hands of the transferor increased or decreased by gain or loss recognized to the transferor under the law applicable at the time of transfer. The basis of the agreement to your corporation is therefore $1,800.00 and the loss of $21,527.78 has been disallowed." In lieu of the deduction of $21,527.78, respondent allowed the petitioner "license expense" of $1,550, representing 31/36ths of $1,800 which was the cost basis of the license agreement to Mrs. Parker. *115 Petitioner paid its income and excess profits tax for the calendar year 1943 in the following amounts and on the following dates: Income
Excess
Date
Tax
Profits Tax
March 25, 1944
$2,131.76
$5,876.92
June 19, 1944
2,131.76
5,876.92
September 11, 1944
2,131.76
5,876.92
December 16, 1944
2,131.76
5,876.92
The fair market value of the license agreement at the time it was assigned by Mrs. Parker to petitioner on January 23, 1937, was $25,000. Opinion ARUNDELL, Judge: The primary issue to resolve is the amount of petitioner's loss upon its cancellation of the Atwood license in 1942. If we hold that the petitioner acquired it in a tax-free exchange under section 112 (b) (5) of the Internal Revenue Code, as determined by respondent, the loss must be computed upon the cost basis of the transferor, Mrs. Parker. Section 113 (a) (8), Internal Revenue Code. If acquired in a non tax-free exchange, as petitioner contends, the basis then is cost to petitioner. Section 113 (a), Internal Revenue Code. To qualify as a tax-free exchange, section 112 (b) (5) requires, in the case of a transfer *116 of property by one or more persons to a corporation solely in exchange for stock or securities, that the amount of stock and securities received by each transferor must be substantially in proportion to his interest in the property prior to the exchange. Here Gordon Parker received 50 shares of petitioner's stock in exchange for $5,000 in cash Lucius Thayer and his associates received 90 shares in exchange for $9,000 in cash, and Mrs. Parker received 250 shares in exchange for the license. Petitioner's nopar stock was determined by all the parties to have an agreed value of $100 per share and we have so found. [1] Since Mrs. Parker received shares in petitioner valued at $25,000, the only question is whether the fair market value of the license she gave in exchange was also $25,000. *117 "Fair market value" is defined as the price at which property changes hands between a willing buyer and a willing seller both bargaining free of compulsion. Phillips v. United States, 12 Fed. (2d) 598; M. J. Tumble, 14 B.T.A. 348, 359. See Regulations 111, section 29.23(m)-7. The only available evidence of this nature in the instant case is the agreement arrived at by the Parkers and Thayer when they met to determine the terms upon which Thayer and his associates would supply the requisite capital in a corporation formed to exploit the license. Foremost among the factors influencing the bargaining position of the parties was the question of control of the corporation. Thayer stated to the Parkers that such control would be the price of obtaining venture capital. Mrs. Parker replied that because of her desire to retain control of the corporation, she would be willing to accept half of what Thayer estimated the license to be worth. On this basis Thayer agreed that, together with his associates, he would subscribe to $9,000 worth of petitioner's stock. Thus, as a result of such arm's length dealing, Gordon Parker acquired 50 shares of stock for $5,000, Thayer, *118 et al., acquired 90 shares for $9,000, and Mrs. Parker acquired 250 shares for the license. From this evidence of a "sale price" of $25,000, we conclude that the fair market value for the license at the time of its transfer to petitioner was $25,000. See General Outdoor Advertising Co., 32 B.T.A. 1011, 1023-1024. This determination of value is corroborated by subsequent transactions of petitioner. Petitioner set the license up on its books at $25,000, so treated it on its tax returns, and computed its loss on cancellation on the basis of $25,000. Petitioner has endeavored to show that it acquired the license in a non tax-free exchange by reason of its contention that the license possessed a fair market value of $35,000 at that time. The only substantiation which petitioner has offered of this figure is the opinion testimony of its expert witness. This expert, a consulting engineer to the plastics industry, made a careful study of the process involved in the Atwood license and the patents on which it was based and briefly researched the state of the art in the field of panel materials for the period in question. His valuation of $35,000 for the license was based, however, *119 upon an initial maximum utilization of the license on a scale of operation quite different from that actually contemplated by the parties. Moreover, it is obvious that any opinion of value for the license would, from its very nature, be highly conjectural. The license was founded upon a new and untried process for which the fundamental patent was not issued until a date subsequent to the license agreement. Its value at the time of transfer to the petitioner was purely speculative and dependent in large measure upon the resources of the company that would exploit it. While the opinion of petitioner's expert has probative weight, the best evidence here of fair market value was the price fixed by the parties in their arm's length negotiations. Gage Brothers & Co., 13 T.C. 472, 482. In our opinion, a fair preponderance of the evidence supports the Commissioner's determination that the license possessed a fair market value of $25,000 at the time of its transfer to petitioner. We so hold. We further hold that petitioner acquired the license in a tax-free exchange and that it must use the cost basis in the hands of the transferor, Mrs. Parker, which has been stipulated as *120 $1,800. Petitioner's deductible loss on cancellation of the license in 1942 is, therefore, its unexpired term on this cost basis, or 31/36ths of $1,800. Our decision in respect to the petitioner's basis of the license agreement is determinative of the various allegations of error set forth in the petition concerning the amount at which the license may be included in petitioner's equity invested capital for the years 1941, 1942, and 1943 which is the cost basis of the transferor. Section 718 (a) (2), section 113 (a) (8); Kay-Fries Chemicals, Inc., 14 T.C. 900. Decision will be entered under Rule 50. Footnotes
1. In American Bantam Car Co., 11 T.C. 397, 403, aff'd., per curiam, 177 Fed. (2d) 513, CCA-3; certiorari denied, 339 U.S. 920 - It has been held that money turned over to the transferee corporation by the transferors does not prevent a tax-free exchange, for it is includible within the term "property" in section 112 (b) (5). Regulations 111, sec. 29.112 (b)-5; C.B. 1944, p. 219; Halliburton v. Commissioner, 78 Fed. (2d) 265↩. * * *