Appeal of SARAH BACKER, WILLIAM        Docket No. 239.
BACKER, WALDRON P. BELKNAP,
AND SAMUEL LEVY, as executors of
the estate of George Backer, deceased.

> The expense of defending an indictment for perjury growing out of the taxpayer's business *held*, upon the facts, not to be a deductible ordinary and necessary business expense.

Submitted December 1, 1924; decided December 18, 1924.

*Samuel Levy, Esq.*, and *Reuben Rodecker, Esq.*, for the taxpayer.

*Robert A. Littleton, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, and TRUSSELL.

This appeal involves a proposed assessment of personal income taxes amounting to $12,315.06 against the estate of the decedent because of an alleged improper deduction by him in the year 1920 of business expenses consisting of attorney's fees and other costs of conducting his defense to a charge of perjury. Oral hearing was had and testimony introduced.

#### FINDINGS OF FACT.

In the year 1920, George Backer, the decedent taxpayer, was a prominent builder in the city of New York. He had been in the business for a number of years, individually and in association with others, and had established a substantial and creditable reputation. During the years 1919 and 1920, he was engaged in the construction of three large commercial buildings in the heart of the city of New York; the Heckscher Building, a 32-story tower building on the southwest corner of Fifty-seventh Street and Fifth Avenue; the Textile Building, a 16-story building on Fifth Avenue covering the block from Thirtieth to Thirty-first Streets; and the Penn Terminal Building, a 16-story building on Seventh Avenue covering the block from Thirtieth to Thirty-first Streets. The cost of construction of these buildings was over $7,000,000.

In the years in question the building situation in New York was very serious, and finally resulted in the so-called Lockwood investigation by a committee of the State legislature. It transpired that certain labor leaders were abusing their offices by a system of blackmail. One Brindell was later convicted and sentenced to a term in prison. The practice was to call a strike of the building trades working on a building in the midst of its construction when materials were on the ground and many obligations had been incurred and the greatest harm would result from delay in construction, and then to demand a price from the builder for calling off the strike so that the construction could proceed. A failure to pay the price meant

the probability of enormous loss and perhaps ruin.  Not only would the work in process rapidly and seriously deteriorate and the delay in completion involve the certain loss of expected profits and return of investment, but contractual liability in large sums would also immediately be incurred to those who produced the material, the owners of the building, and numerous subcontractors.  The business reputation and good will of the builder and his financial credit would be imperiled.  The delay thus caused at the time directly after the war when there was a crying need for additional building was regarded as a matter of important public concern and this and the criminal aspects of the practice referred to gave rise to the investigation.

Because of his previous success, his established reputation and the financial magnitude of the building operations in which he was then engaged, Backer was especially vulnerable to the practice referred to and was compelled to make a large payment, not, he said, to Brindell, but to others associated with him in the same nefarious practice.  He was subpoenaed to testify before the Lockwood committee in 1920 while the three buildings were still in construction, and was asked whether he had paid the money to Brindell.  Although under the New York penal law it was a crime to bribe a labor leader (Penal Law New York, sec. 380), such crime was not punishable if the person committing it testified under subpoena to the giving and accepting of the bribe (sec. 381).  Backer testified before the Lockwood committee that he did not pay the money to Brindell and stuck to this statement.  He also said, in the first instance, that he had lost the money, but later, before leaving the witness stand, recanted and said that he had paid the money to some persons not identified but not to Brindell.  If he changed his testimony before he left the witness stand and told the truth he was, under New York law, not guilty of the crime of perjury (*People* v. *Gillette*, 111 N. Y. Supp. 133; 126 App. Div. 665).  He was, however, indicted for perjury and tried.  The jury disagreed, and subsequently the case was dismissed.  The defense to the criminal action cost him in attorney's fees and other expense the sum of $40,624.88, which he paid in 1920, and which he deducted on his return for that year as an " ordinary and necessary expense paid or incurred during the taxable year in carrying on his trade or business" (Revenue Act of 1918, sec. 214(a) (1) ).  The Commissioner disallowed the deduction and has determined a deficiency of $12,315.06 as a result of such disallowance.

### DECISION.

The determination by the Commissioner of a deficiency of $12,315.06 is approved.

### OPINION.

JAMES: The question is whether under all the circumstances set forth in our findings of fact the amount actually paid by the decedent taxpayer to defend himself against the criminal prosecution for perjury is an ordinary and necessary business expense or is a personal expense.  If it is the former, it is deductible in determining his net income; if the latter, it is not deductible.

The Commissioner asserts that it is a personal expense, because, as we understand, the crime charged is necessarily a personal crime and the defense thereto can not in the nature of things be a matter of business. Manifestly the commission of perjury can, under no circumstances, be recognized as part of a taxpayer's business; and so the expense incident to such criminal activity can likewise not be recognized. We must regard this as written into every statute, especially as to such common crimes as are prohibited generally throughout the land—those *mala in se*, which have immemorially been regarded as contrary to public welfare. It would be an anachronism to say that such an act, so inimical to the public interest as to justify punishment for its commission, may at the same time be so recognized that the expense involved in its commission is sanctioned by the revenue law as an ordinary and necessary expense of carrying on a business.

But in this case there has been no crime in contemplation of law— a lie was told on the witness stand, and an indictment, trial, disagreement and the discharge of the defendant have followed. Under such circumstances, may the defendant claim as an ordinary and necessary expense of his business a deduction of the cost of defending himself against this charge?

We are dealing here with the age-old question of proximate cause. If the charge of perjury proximately resulted from the business carried on by George Backer, it may be conceded that the expense of defense against that charge was an ordinary and necessary expense of carrying on his business. If, on the other hand, the business of contracting was not proximately related to the charge of perjury, then the cost of defense was not a business expense and may not be deducted as such in the taxpayer's income-tax return.

We have already decided in the *Appeal of Frank H. Sullivan*, 1 B. T. A. 93, that the cost of operating an automobile between one's place of business and his residence is not an ordinary and necessary expense. Fundamentally, the reason for this is that the proximate cause of the automobile transportation is not the place of location of the business but the place of location of the residence. Nevertheless, if one ignores the element of personal choice in the selection of a place of residence, it is possible to support a claim for a deduction such as that in *Sullivan's Appeal* with persuasive reasoning. It is a fact that if men are carrying on business in a large city and desire to surround themselves with the comforts of life to which their earning capacity entitles them, they must select a residence far removed from their place of business and must provide themselves in some manner or other with the means of transportation thereto.

It is true that Backer, being a prudent person, chose, when called before the Lockwood Investigating Committee, to lie rather than to incur the hostility of a powerful and unscrupulous group of labor leaders and the inevitable jeopardy to his person and to his fortune. It is equally true that a man of courage and a proper sense of civic responsibility would neither have paid the bribe in the first place, nor lied about it in the second.

Business expenses of the ordinary and legitimate kind are not matters of choice in the broadest sense of the word. It is true that a business man may choose to buy or not, but if he does not buy, he

does not sell; it is true that he may choose to employ or not, but if he does not employ labor and other assistance, he does not produce commercially valuable results. We are not willing to concede that the carrying on of business in the ordinary manner in the city of New York or elsewhere, under the Government of the United States, is necessarily accompanied by the commission of illegal acts or by the accusation of the commission of such acts whereby business men are subjected at least to the charge of the commission of crimes. We doubt if business men generally would concede that bribery and lying are ordinary and necessary business acts. If they are not, then the cost of bribes and lies are not ordinary and necessary business costs. We do not believe that it is in the interest of sound public policy that the commission of illegal acts should be so far protected or recognized that their cost is regarded as a legitimate and proper deduction in the compution of net income under the revenue laws of the United States.

But it is said that Backer did not claim this deduction as a guilty man, but as an innocent one. As we view the case, it is wholly immaterial whether he was innocent or guilty. The question is whether the act whereby he laid himself open to the charge of perjury was one which was ordinarily and necessarily committed in the course of his business. We are unable to see any proximate connection between the two.

All members of the Board concur, except STERNHAGEN and TRUSSELL, who dissent, and SMITH, who took no part in the consideration and determination of the appeal.