## GOULD PAPER CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 368.

Circuit Court of Appeals, Second Circuit.

Aug. 10, 1934.

Barnet D. Golden, of New York City, and Geo. E. H. Goodner, of Washington, D. C., for petitioner.

Frank J. Wideman, Asst. Atty. Gen., and J. P. Jackson and Sewall Key, Sp. Assts. to Atty. Gen., for respondent.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The petitioner is a New York corporation, now and for many years past engaged in

manufacturing paper from pulp wood usually cut on its own land. Its principal place of business is at Lyons Falls, N. Y. This appeal is concerned with only two parcels of this wood land. Both are located on the westerly side of the Adirondack Mountains in New York. They are known, respectively, as the Moose River and Tug Hill tracts. The Moose River land is about 77,000 acres in extent, and on March 1, 1913, there were about 925,000 cords of merchantable soft wood 10 inches or more in diameter standing upon it. Tug Hill comprised about 30,317 acres with a March 1, 1913 stand of such timber amounting to approximately 155,490 cords. In its amended returns for the three years in issue, the petitioner took depletion deductions of $4.75 per cord as the March 1, 1913, fair market value of the pulpwood as standing timber. The Commissioner allowed only $3.50 per cord, and the Board upheld his valuation.

In 1917 the petitioner cut 36,223.68 cords of pulpwood and used only 13,187.05; in 1918 it cut 41,869.65 cords and used only 19,799.01 cords; while in 1919 it cut only 20,429.52 cords, but used 28,394.38 cords. The Commissioner allowed depletion deductions on the amount of timber used instead of on timber cut and again the Board upheld the Commissioner.

Because of a mistake as to the number of cords used in the years involved, the allowances by the Commissioner were actually $1.269 per cord in 1917, $2.107 per cord in 1918, and $3.8506 per cord in 1919. The Board corrected the mistake and allowed depletion at the rate of $3.50 per cord in each year. This resulted in reducing the allowance for 1919. As the Commissioner made no claim for a reduction of this depletion allowance before the hearing in the Board of Tax Appeals, the petitioner now claims the right to deduct for 1919 at the rate of $3.8506 per cord.

From 1910 until into 1918, the petitioner purchased timber owned by the Adirondack League Club adjacent to its own holdings. In accordance with its contract for such purchases, it advanced money to the club from time to time which drew interest until the timber purchased was cut. Upon an adjustment of accounts in 1916 and 1917, it was discovered that petitioner had been allowed credit for interest to the amount of $2,916.21 in excess of that to which it was entitled. In August, 1919, the petitioner, upon demand of the club, paid to it this amount. The petitioner kept its books on the accrual basis and, in its return for 1918, took the payment as a deduction. The Commissioner disallowed it and was sustained by the Board.

During the years in issue, the petitioner owned one-half of the capital stock of the Glenfield & Western Railroad Company. This railroad had been built primarily to haul timber for the petitioner and another corporation in the same business which also owned one-half of its capital stock. The railroad company had been organized with power to acquire lands by eminent domain, and was subject to regulation by the Public Service Commission of New York which fixed its rates. It did not make operating expenses, and, as most of its business was hauling timber for its stockholders who had no other feasible way to get their timber, the petitioner agreed to advance, and did advance, to the railroad company one-half of its deficit, being $6,348.25 in 1917, $12,750.00 in 1918, and $16,172.00 in 1919. Such amounts were carried on the books of the petitioner, at least until 1921, as debts owed it by the railroad company. The amounts for each year were taken as deductions by the petitioner on the ground that they were ordinary and necessary expenses of its business. The Board sustained the Commissioner in disallowing the deductions.

Logs cut and left in the woods by the petitioner were not inventoried at all, and the Board included them in invested capital at the original cost of the timber. The Commissioner conceded that they were to be treated as part of the capital investment. The petitioner was dissatisfied with the original cost value allowed, however, and claimed the right to include them at March 1, 1913, cost of the standing timber plus the cost of cutting, peeling, or otherwise processing them to the time as of which they were inventoried.

The petitioner employed, and in 1917 paid, an attorney who defended it and its president in proceedings under the anti-trust laws. The Commissioner at first allowed this expense as a deduction for 1917, but raised the issue in his answer in the proceedings before the Board and the deduction was disallowed.

1. Whether or not there was any error in taking the March 1, 1913, value of the standing timber at $3.50 per cord instead of at the higher value claimed by the petitioner depends, of course, upon whether the evidence on that issue supports the finding. It is purely a question of fact. There was evidence to the effect that it was worth less than the Board found and other evidence that it was worth more. This consisted of the testi-

mony of witnesses shown to have special knowledge of the value of standing pulpwood in the vicinity of this timber at that time, of the cost to the petitioner, of the prices at which such timber had been sold both before and after 1913, and of the local appraisals for tax purposes. The Board had a rather comprehensive basis in the testimony for finding the value in fact, and, as that fact as found has substantial support in the evidence, we accept it.

In connection with his proof of value, the respondent introduced in evidence a blank, known as form T of the Treasury Department, which contained questions it was customary to have answered by taxpayers who owned timber. He also introduced the answers this taxpayer had made to such questions. The petitioner now claims that the respondent was conclusively bound by the value the petitioner itself had thus placed upon the timber. Proceedings before the Board are conducted in accordance with the rules of evidence applicable in courts of equity in the District of Columbia, and Lyon v. Bursey, 36 App. D. C. 235, is relied upon by the petitioner to establish its broad contention that its own statement of value was documentary evidence absolutely binding upon the respondent as soon as he introduced it. In the above case, however, the issue was whether or not the plaintiff in an action in ejectment had, by amending his original declaration in a suit to recover possession of all of the north half of a lot and taking judgment for an undivided half of that portion, been barred by estoppel from bringing a subsequent action to recover what he had previously abandoned. In the second suit, he introduced in evidence the record in the former action, and it was held to bar further recovery. A motion by the defendant at the close of the plaintiff's evidence in chief for a directed verdict was held properly granted since the case made by the plaintiff contained the evidence of the record on which the defendant relied and there was no question for the jury in respect to the judgment record which the plaintiff himself had introduced. The court said of the plaintiff, "Having elected to pursue this course, it does not lie in his mouth either to impeach his own evidence, or assert that the record does not import verity." But this decision does not support the assertion the petitioner here makes to the effect that the respondent could not contradict a mere self-serving statement of the petitioner simply because the respondent introduced it in evidence. Nor are we willing to subordinate the substantial rights of a party to any such extremely technical theory of a rule of evidence.

2. The petitioner cut pulpwood during these three years in such amounts as it saw fit and used from its accumulation of such supply whatever it needed. While standing, the wood may justly be considered as purely raw material and when cut and stored for use as partly manufactured. The basis of such a depletion allowance as the petitioner here is entitled to have is the fact that as soon as it began to cut its standing timber it began to exhaust its supply. The real amount by which it lessened its supply in each year was the amount it cut. Furthermore, any loss in transit to the mill or otherwise sustained would serve to distort an accurate depletion allowance if the timber used each year in manufacturing paper was taken as the allowed deduction rather than the timber cut. Regardless of such reasons, however, the applicable status and regulations afford the real grounds for holding that the Board was in error in this respect.

The Revenue Act of 1916, under which the 1917 tax was imposed, contained no specific provision for the deduction of an allowance for depletion of timber, but Regulation 33, art. 173, promulgated January 2, 1918, provided:

"Art. 173. Corporations owning timber land and logging off the timber and manufacturing it into lumber, will, if the timber was acquired prior to March 1, 1913 be permitted to exclude from gross income either through a deduction from gross receipts or through a charge into the cost of manufacturing the timber into lumber, an amount equivalent to the fair market price or value of the standing timber as of March 1, 1913."

The Revenue Act of 1918, under which the 1918 and 1919 taxes were imposed, in section 234 (a) (9), 40 Stat. 1077, expressly provided for a reasonable allowance for depletion of timber among other things "based upon cost including cost of development not otherwise deducted: Provided, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date."

And Regulation 45, art. 229, promulgated by the Treasury Department, dealt with timber depletion so far as it need now be quoted as follows:

"The allowance for depletion of timber in any taxable year shall be based upon the number of units of timber felled during the year and the unit value of the timber in the timber account or accounts pertaining to the timber cut. * * * The amount of the deduction for depletion in any taxable year with respect to a given timber account shall be the product of (a) the number of units of timber cut from the given account during the year multiplied by (b) the unit value of the timber for the given account for the year. * * * The depletion of timber takes place at the time the timber is felled. Since, however, it is not ordinarily practicable to determine the quantity of timber immediately after felling, depletion for purposes of accounting will be treated as taking place at the time when, in the process of exploitation, the quantity of timber is first definitely determined."

These regulations have long been, and still are, in force, and so afford reliable evidence of the meaning of the statute. Under them "depletion of timber takes place when the timber is felled." For practical reasons this means when the timber felled is first measured so as to determine its amount, but that is of no importance in this case, since on December 31st in each of the years the amount of timber felled during the year had been determined. An accounting adjustment which gives the petitioner freedom from income taxation by way of depletion based on the March 1, 1913 value of that standing timber without the variables which might well enter into any computation based on timber used can best be made by taking the depletion when the timber is felled, or what in practice is the equivalent of that, when the felled timber is counted, just as the regulations require, and that is the depletion which should have been allowed.

There is, however, another adjustment which needs to be made in order not to distort income in this connection. The petitioner carried only the timber used into its inventory in each of the taxable years. It is obvious that depletion should not be allowed on timber cut and income computed when an inventory into which only the timber used was carried. This would permit a depletion deduction on one basis and the computation of taxable income on another. So when the timber cut is taken as deductible depletion the inventory for each year should be adjusted accordingly. This is the effect, we think, of the Board's decision in Appeal of Clearfield Lumber Co., 3 B. T. A. 1282, on which

it relied in this case, and when a recomputation is made will make the result here correspond to that in the Clearfield Case.

3. As to the claim that the Board should have allowed the deduction at $3.8506 per cord for 1919 because the Commissioner mistakenly allowed an amount which, when figured on the correct number of cords, came to that amount per cord and failed to raise the question prior to the hearing before the Board little need be said. It is enough to point out that, regardless of any other reasons for supporting the action of the Board in this respect, no deficiency was found for 1919. Under section 284 (e) of the Revenue Act 1926 (26 USCA § 1065 (e) and note), the Board is given jurisdiction to determine the amount of the overpayment when it finds that there is no deficiency and further finds that there has been an overpayment. In no event is the petitioner entitled to more than the correct amount of such overpayment. There is no statute requiring the government to account, and it is under no obligation to account, for taxes paid to it unless they exceed what might have been lawfully assessed and collected. Lewis v. Reynolds, 284 U. S. 281, 52 S. Ct. 145, 76 L. Ed. 293.

4. The claim to deduct the amount paid the Adirondack League Club for excessive interest in 1919 was correctly disallowed for two reasons: First, it does not appear that in any of the years when credit for this excessive interest was received by the petitioner it paid taxes computed upon it. Its books were kept on the accrual basis, and the amount of interest accrued on its books is not shown to have been incorrect. Second, the error in receiving credit for this interest was discovered before the statute of limitations had run as to the years involved, and, if the returns were in fact erroneous, the petitioner should have amended them and secured an adjustment. See Commissioner v. Old Dominion S. S. Co. (C. C. A.) 47 F.(2d) 148.

5. Whether the amounts advanced to the Glenfield & Western Railroad Company were correctly disallowed as deductions when the petitioner sought to take them as such in its amended returns depends upon whether or not they were loans to the railroad company. The Board found that they were and our decision must be in accord if there was substantial evidence to support that finding. There was such evidence. The petitioner carried such advances on its books as loans to the railroad during the years in question and re-

702

ported the amounts as assets in its 1921 capital stock return. Of course this is not conclusive, but, as is stated in the Board's opinion: "No explanation is offered by the petitioner as to why, if the amounts actually constituted operating expenses, it so consistently treated them as assets." At any rate the evidence supported the finding made, and we must take the advances to have been loans.

 6. We have already said that the timber felled should be carried into the inventory in each year as a compensating measure in relation to the allowance of standing timber depletion. The inventory value of the standing timber as invested capital for purposes of taxation is the cost of the timber. La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998. Strictly speaking, the capital invested in the standing timber plus the cost of cutting, peeling, piling, and whatever else, if anything, had been done to it as of the time of inventory was the capital invested in the pulpwood, but these expenses in addition to the cost of the standing timber were incurred as a part of the cost of manufacturing the timber into paper. As such they were deductible, however, as ordinary and necessary expenses incurred in conducting the business of the petitioner, and, if they should be added to the original cost of the raw material and so be permitted to increase the invested capital account, the petitioner would get a double deduction benefit which the statute does not permit.

 7. The cost of defending the proceedings against the petitioner and its president in 1917 are deductible, if at all, because they were ordinary and necessary expenses of the petitioner's business. Part of these expenses were incurred in defending a criminal action against the president and part in defending both the petitioner and its president in an action in equity. The effect of membership in an organization known as the News Print Manufacturers' Association was a part of the issue. We considered at some length the question here presented in Burroughs Bldg. Material Co. v. Commissioner, 47 F.(2d) 178, and reached the conclusion that a taxpayer could not deduct such expenses as these when incurred in its own behalf. As to the part expended in behalf of its president, the petitioner has even less reason to claim a deduction.

The decision of the Board of Tax Appeals is modified, and cause remanded for further proceedings in conformity to the views herein expressed.