*Decisions will be entered under Rule 50.*

FRANK J. MATULA, JR., AND ESTHER MATULA, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92559.   Filed September 3, 1963.

*Turner L. Smith* and *Joseph Sternbach*, for the petitioners.
*L. Justin Goldner* and *Aaron S. Resnik*, for the respondent.

### OPINION

HOYT, *Judge:* Respondent determined deficiencies in the income tax of petitioners for the years 1956 and 1957 in the amounts of $2,669.65 and $8,537.59, respectively. The deficiencies result in each instance from the addition to and inclusion in petitioners' taxable income by respondent of legal fees and costs paid by the employer of petitioner Frank J. Matula, Jr. The only issue presented is whether such payments constitute taxable income to petitioners under section 61 of the Internal Revenue Code.[1]

Some of the facts have been agreed to and stipulated by the parties and are found accordingly.

The petitioners, Frank J., Jr., and Esther Matula, were husband and wife and resided in Los Angeles, Calif., during 1956 and 1957. They filed joint income tax returns for those years with the office of the district director of internal revenue at Los Angeles. Esther Matula is a petitioner herein because she filed joint returns with her

---

[1] All Code references herein are to the Internal Revenue Code of 1954 unless otherwise specifically indicated.

husband; the term petitioner as used hereinafter will refer only to Frank J. Matula, Jr.

Petitioner was employed as secretary-treasurer of local 396, Package and General Utility Drivers, International Teamsters Union,[2] in the years in question; he had been so employed for many years and at time of trial was still so employed. In that office he was the operating head and manager of the local with power and authority to hire and fire union employees. He was a member of the union's executive board and presided as chairman at membership meetings.

In September of 1955, the California Assembly Standing Committee on Governmental Efficiency and Economy, hereinafter referred to as the committee, began a series of official legislative hearings in Los Angeles regarding the disposal of rubbish and garbage in that area. The heads of certain organizations were subpoenaed to testify and produce records of their concerns. These included Sam Egigian, president of the State Rubbish Collectors' Association and Fred Ferrier, president of local 396. Various other witnesses were served with subpoenas to appear before the committee including business agents of the local and petitioner, Frank J. Matula, Jr. He was subpoenaed individually and not in his official capacity as secretary-treasurer of the local. In response to his subpoena, Matula appeared, was sworn and testified under oath before the committee on October 3, 1955.

Subsequently on June 7, 1956, Matula was indicted by the Los Angeles grand jury for perjury in violation of section 118, Penal Code of California, a felony. The indictment charged that the testimony he had given before the committee on October 3 of the previous year was knowingly false with respect to material matters.

In due course the petitioner entered a plea of not guilty to the charge in the indictment and he was tried by a jury in the Los Angeles County Superior Court, beginning March 18, 1957. The trial concluded on May 11, 1957, and the jury found the defendant guilty as charged by the indictment. Thereafter, the petitioner appealed his conviction through appropriate California appellate courts and ultimately to the Supreme Court of the State of California, where motion for a new trial was denied and the judgment of conviction was affirmed. The Supreme Court of the United States denied petitioner's petition for certiorari.

On August 19, 1957, petitioner had been sentenced in the Superior Court; he was granted probation for a period of 5 years on condition, *inter alia*, that he serve the first 6 months thereof in the county jail and pay a fine of $2,500. After his appeals were lost he served approximately 5 months in jail and paid his fine.

---

[2] Petitioner's employer will be referred to throughout this opinion as the union, or local 396, or the local.

Petitioner and the local union anticipated his indictment and the day before action by the grand jury was taken there was a special meeting of the union's executive board at which petitioner "explained that he must put up bail at the time of arraignment in his case that will be pending in Superior Court."

At this meeting the board passed motions that "we" pay the premium on the bail bond and hire lawyers to defend the officers and business agents of the local union. Several officers and agents of the local had testified before the committee and Philip Watler, a business agent of the local, was also indicted about the same time as the petitioner.

Grant B. Cooper, a practicing lawyer in the Los Angeles area, was contacted through another lawyer who had offices in the same building, and he was initially seen by the petitioner and the local's regular lawyer, John C. Stevenson. He was retained by the local to defend petitioner and Watler. Later Grant B. Cooper's wife, Phyllis N. Cooper, also a practicing lawyer, was retained to assist her husband with the cases. After the petitioner's conviction, Cooper and another lawyer, named Selvin, were retained by the local to prosecute the various appeals that were undertaken. All of these actions were taken with the full knowledge, consent, and approval of petitioner. In fact, he was the moving factor, as is demonstrated by the minutes of various board meetings. Right after the petitioner's indictment, at a meeting of the board on June 21, 1956, petitioner reported to the board on the case. The minutes of the meeting read, in part, as follows:

The Secretary made a report regarding the case in court against himself and Business Agent, Philip Watler. The Board was pleased to know that he had obtained the finest attorney in the city to represent the officers of this Local union. A motion was made and seconded that the Secretary be impowered to do everything humanly possible and leave no stone unturned, in order to defend himself and Business Agent, Philip Watler. Motion carried unanimously. The Secretary explained to the Board about the cost of the attorneys for their defense, and they were more than pleased with the effort the Secretary has made so far in figuring out ways and means to bring our case to a successful conclusion.

From time to time after the union had first voted to hire lawyers to defend their officers and agents, the petitioner reported to the executive board and to the general membership on developments in, and the condition and progress of, his case. The board met regularly toward the end of each month and there was a general membership meeting each month except during the 3 summertime months. Both the board and the membership voted to pay the legal fees, expenses, and costs incurred in connection with the petitioner's defense of the criminal charge of perjury and of the subsequent appeals, and bills for such charges were approved for payment. These fees and expenses were paid by local 396 out of its general operating funds as follows:

$ 7,897.39 in 1956
$20,201.18 in 1957

None of the payments in question were made to or through the petitioner; the local paid the respective lawyers for their fees and expenses directly by its checks.

Local 396 was not a party defendant in the criminal proceeding against the petitioner; it was not named as a defendant in the indictment, nor was it separately charged with any criminal offense.

After the indictment and before the petitioner's trial, the local voted unanimously to reelect Matula as its secretary-treasurer. Since then and even after conviction and loss of petitioner's appeals, Matula has been reelected to the same position on several occasions, the last being on December 9, 1962. The union paid petitioner his full salary during the entire period including the period he spent in jail.

Prior to the time the petitioner testified before the committee, he and another union agent subpoenaed to testify were advised by the local's regular attorney, John C. Stevenson, to tell the truth. Local 396 never authorized petitioner to give false testimony before the committee and had no knowledge prior to his appearance before the committee on October 3, 1955, as to what his testimony would be. The local never ratified or confirmed the commission of perjury by petitioner.

Petitioner did not report any of the amounts paid by local 396 to his lawyers as income in his income tax return for any year.

The crucial facts in this case are:

Petitioner, secretary-treasurer and manager of local 396, gave false testimony before a California legislative committee.

He was indicted for perjury, was tried, and convicted.

He lost his appeals, was sentenced, and paid his debt to society.

The local, acting through its executive board, retained lawyers to defend petitioner and to prosecute his appeals, and paid their fees and expenses from its general funds. The membership of the local approved these actions and expenditures.

The union was not indicted and no part of the payment of fees and expenses were paid for its own defense. All amounts involved were paid for the defense of the charges against petitioner and for the appeals taken by him following his conviction.

On these facts, the sole question is whether the payments constitute taxable income to petitioner in the years in which they were made under section 61, I.R.C. 1954.

We have held in a long line of cases, beginning with *Sarah Backer*, 1 B.T.A. 214 (1924), that payments of legal expenses incurred in the unsuccessful defense of criminal charges are not deductible for income tax purposes. *Henry L. Peckham*, 40 T.C. 315 (1963); *Thomas A.*

*Joseph*, 26 T.C. 562 (1956), and cases there cited. Petitioner's reliance on *Commissioner* v. *Heininger*, 320 U.S. 467 (1943) ; *Deputy* v. *du Pont*, 308 U.S. 488 (1939) ; *Welch* v. *Helvering*, 290 U.S. 111 (1933) ; and *Kornhauser* v. *United States*, 276 U.S. 145 (1928), is misplaced. Those cases are clearly distinguishable on their facts, and we do not understand any of them to require the allowance of a deduction of such expenses. *Thomas A. Joseph, supra;* cf. *Tank Truck Rentals, Inc.* v. *Commissioner*, 356 U.S. 30 (1958), affirming 242 F. 2d 14 (C.A. 3, 1957), 26 T.C. 427 (1956).

It is also well settled that a corporation which pays the fines and/or legal expenses of unsuccessful defense of criminal charges against its officers or employees may not take an income tax deduction for the amounts so paid. *Tank Truck Rentals* v. *Commissioner, supra; Gould Paper Co.* v. *Commissioner*, 72 F. 2d 698 (C.A. 2, 1934), modifying and remanding on other issues 26 B.T.A. 560 (1932) ; *Pantages Theatre* v. *Welch*, 71 F. 2d 68 (C.A. 9, 1934) ; *Burroughs Building* v. *Commissioner*, 47 F. 2d 178 (C.A. 2, 1931), affirming 18 B.T.A. 101 (1929).

Here the issue presented is not as to the deductibility by the corporation of such expenses, but rather whether or not they constitute taxable income to the officer who benefits from the payments. Section 61 of the Internal Revenue Code of 1954 is very broad and all-inclusive in its definition of gross income. The Supreme Court has repeatedly held that Congress has intended, by its broad definition of gross income, to exercise the full measure of its taxing power and tax all gains except those specifically exempted. *Commissioner* v. *Lo Bue*, 351 U.S. 243 (1956), and cases there cited.[3]

We have held that where a corporation pays the fine imposed personally on its president, convicted of willful evasion of the *corporation's* income tax by filing false and fraudulent *corporate* returns, such payments constitute taxable income to the beneficiary. *Irving Sachs*, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833. The only differences between the facts involved in *Sachs* and those presented here are that petitioner there was an officer and minority stockholder rather than merely an officer and employee, and the payments made for his benefit by the corporation were of fines rather than of legal fees and expenses.

We can see no material distinction between the payment of fines imposed following criminal conviction and legal fees and expenses paid in an unsuccessful effort to defend against criminal charges. In the *Burroughs* case, the Court refused to recognize the distinction saying (p. 180) :

---

[3] Whereas these cases involved construction of sec. 22(a), I.R.C. 1939, and sec. 61, I.R.C. 1954, is here involved, the sections are substantially similar and for present purposes can be viewed as the same.

If the fines and costs cannot be deducted, the legal expenses incurred in litigating the question whether the taxpayer violated the law and whether fines should be imposed should naturally fall with the fines themselves.

So, also, if the payment of fines imposed on a corporate officer following his conviction constitutes income to him, the payment of his legal expenses incurred in litigating the question should naturally constitute income to him as well.

We see no valid distinction between the case of an officer-stockholder and an officer-employee. Nor do we feel it necessary to characterize the nature of the payments. Cf. *Mary B. Heyward*, 36 T.C. 739 (1961), affd. 301 F. 2d 307 (C.A. 4, 1962). Whether the payments are regarded as dividends, compensation, or other income to the officer, their taxability to the recipient is the same. The payment of fines or personal legal defense expenses of a corporate officer by his corporation fall within the broad definition of gross income "from whatever source derived" in section 61 of the Code unless some other Code section would exclude them.[4]

Most of the arguments relied upon by petitioner here were made by the taxpayer in *Sachs*.[5] In answering those arguments in *Sachs* we said (p. 820):

> The petitioner contends that he was not enriched by the payment by the corporation, that he was merely indemnified against the loss to which he was subjected by his conduct of the corporate affairs. He argues that his net worth was not increased, pointing out that before the fine was imposed he had the same net worth as he had after it was paid. He further argues that as a prerequisite to a holding that income was received, the obligation which was satisfied must have been a debt incurred for a consideration. He illustrates this by stating that if one buys groceries he receives the value of what he has purchased and that this is his gain, offset by the requirement of payment for them; and if another pays for the groceries, the man is richer by the value of the groceries, not the amount of the payment, which only measures the value of the goods furnished.
>
> Thus the petitioner would have us look to the net result of both the imposition of the fine and its payment by the corporation. But we think this view of the petitioner misses the point entirely. While it is true that the filing of a corporate return was an act on behalf of the corporation, it certainly cannot be said to have been a part of his duty to file a false and fraudulent return. In so doing he became personally liable for the fine and costs. The corporation was not a party to the criminal proceedings and was not liable for the fine to any extent. The petitioner makes some point of the fact that in the indictment and

---

[4] Petitioners do not argue that the payments for their benefit constitute gifts and are therefore excludable on that basis. Certainly there was no indication here that local 398 was motivated by a detached and disinterested generosity toward petitioner and the dominant reason for the payments was to make a gift to him out of affection, respect, admiration, charity, or like impulses. *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960); cf. *Mary B. Heyward*, 36 T.C. 739 (1961).

[5] Whereas the crime committed by *Sachs* was filing a false and fraudulent return for his corporation, petitioner's criminal conviction here was for the more personal crime of perjury. As we observed in *Sarah Backer*, 1 B.T.A. 214, 216 (1924):

Manifestly the commission of perjury can, under no circumstances, be recognized as part of a taxpayer's business; * * *

judgment the petitioner was described as president and treasurer of the corporation. This, however, was merely descriptive and did not in any way make the corporation a party defendant. If the corporation had not paid this amount for him he would have had to pay it out of his own resources. * * *

Here petitioner was the sole defendant in the perjury case. It was petitioner alone who was tried, convicted, fined, and sentenced to jail for the very personal crime of perjury. It was certainly no part of his official duty as secretary-treasurer of local 396 to violate the law by giving false testimony before the California legislative committee, and we have found that the union had no knowledge that he would testify falsely when he appeared before the committee.

We have also found that the local never ratified petitioner's criminal conduct. The record is completely barren of evidence that the union's executive board or its general membership were ever informed of what false testimony was given by petitioner or of the details of his offense. Ratification, in our view, would not alter the tax consequences in any event, and it, of course, presupposes full knowledge of the facts and circumstances. *Jameson* v. *Gavett*, 22 Cal. App. 2d 646, 71 P. 2d 937 (1937), and the other cases on which petitioner relies, are all civil cases involving civil liability of the master for a servant's acts; none of them are tax cases and as *Gavett* points out "approval and ratification by the master *with full knowledge of the surrounding circumstances* may fix liability upon the master for an act of the servant which was outside the scope of employment." (Emphasis added.) Even if the local had ratified petitioner's perjury with full knowledge of the facts and circumstances, it would have incurred no criminal responsibility, been subject to no fine or other penalty. It was not in any way a party to the criminal prosecution of Matula for perjury. Therefore, even with ratification, which we have found did not occur, the criminal proceeding remained personal to the petitioner.

The union was affected only indirectly by being deprived of his services while he stood trial and later served time in jail. The amounts spent for lawyers, costs, and the expenses of trial and appeals were not expended in defense of the local but rather in defense of petitioner personally. The payments by local 396 here involved were payments of personal expenses of petitioner and not of the union. We are not impressed with petitioner's argument that the union was on trial and would be adversely affected by petitioner's conviction.

In *Forty-Four Cigar Co.*, 2 B.T.A. 1156 (1925), we held that expenditures made by a corporation to pay lawyers' fees, expenses, and costs of settling a case with a relative of its president could not be deducted by the company. The board and stockholders duly voted to pay such costs because the corporation's business was being damaged by the family fracas. We said there:

In final analysis, the money and credit of the corporation were paid out for the purpose of settling disagreement in the family of the president of the com-

pany, who owned practically all of the stock. To be sure, it was done with the consent and upon the recommendation of the minority stockholders and officers, who feared that if it were not done the company would be ruined. The transaction amounted to a withdrawal of corporate assets and their use for the personal benefit of the president and principal stockholder. The facts are that the president had insufficient means, except by using the assets of the corporation, to enable him to induce his relative to cease his pernicious activities. That those activities, if continued, would probably have resulted in the ruin of the corporation's business does not, in our opinion, render the payments a loss to or an ordinary and necessary business expense of the corporation, *or deprive them of their essential character as personal expenditures of its president.* [Emphasis added.]

So, too, here we can only conclude that what the union's board or membership felt about the adverse effects of petitioner's criminal prosecution and conviction on their affairs did not change the essential nature of the payments as purely personal to the petitioner. Cf. *Ernest E. Lloyd*, 22 B.T.A. 674 (1931) ; *George L. Rickard*, 12 B.T.A. 836 (1928).

Matula was retained as an employee after his indictment and conviction; his salary was increased by the local union in 1957 and it was continued and paid even while he was serving time in jail. We think that under all of the facts and circumstances disclosed by the record here the payments by the union resulted in an economic benefit to and enrichment of the petitioner. If the union had not retained lawyers for petitioner and then paid their fees and costs, he would have been compelled to retain and pay his own lawyers and expenses in defending himself against the perjury charge and prosecuting his appeals. He arranged, acquiesced in, and approved the selection and retention of the lawyers to represent him. He benefited personally and directly from such actions and payments, and the result was the same as if the union had paid the amounts involved to the petitioner and he had, in turn, made payments to his lawyers for their fees and expenses.

We approve the respondent's determination that the petitioner received taxable income in each of the years upon the payment by local 396 of his legal fees and expenses incurred in connection with his unsuccessful efforts to avoid conviction for perjury.

*Decision will be entered for the respondent.*