Joseph Paul Glimco and Lena Glimco v. Commissioner.
Glimco v. Commissioner
Docket No. 94562.
United States Tax Court
T.C. Memo 1967-119; 1967 Tax Ct. Memo LEXIS 138; 26 T.C.M. (CCH) 547; T.C.M. (RIA) 67119; May 31, 1967
Edward J. Calihan, Jr., 53 W. Jackson Blvd., Chicago, Ill., and Gene M. Zafft, for the petitioners. George G. Young, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Deficiencies in the income tax and additions to the tax have been determined by respondent as follows: Additions to tax
Sec.
Sec.
6653(b)
294(d)(2)
Income tax
I.R.C.
I.R.C.
Year
deficiency
1954
1939
1954
$26,946.82
$13,473.41
$1,710.96
1955
23,638.60
11,819.30
1956
27,338.48
13,669.24
1957
17,699.62
8,849.81
Some of the issues raised by the pleadings have been disposed of by stipulation and such disposition will be given effect under Rule 50. The remaining issues are (1) whether *139 legal fees and costs paid by the employer of petitioner Joseph P. Glimco are includable in the taxable income of petitioners, and if so, are such payments deductible by petitioners as ordinary and necessary business expenses, (2) whether petitioners understated on their 1956 return net long-term capital gain realized from the sale of real estate in the amount of $4,074.20, and (3) whether petitioners realized and failed to report dividends from American Telephone and Telegraph stock in the years 1956 and 1957 in the respective amounts of $244.75 and $319.00. General Findings of Fact All stipulated facts are found accordingly. On the date of filing of the petition herein, petitioners Joseph P. and Lena Glimco were husband and wife who resided at Riverside, Illinois. For each of the calendar years 1954 through 1957, petitioners filed joint income tax returns upon the basis of the calendar year and upon the cash receipts and disbursements method of accounting with the office of the district director of internal revenue at Chicago, Illinois. Issue 1 Findings of Fact During the period from sometime in 1940 through the taxable years in question, petitioner Joseph Glimco *140 (hereinafter sometimes referred to as petitioner) was employed by the Taxicab Drivers, Maintenance and Garage Helpers Union, local 777 (hereinafter referred to as the union, local 777, or the local), at Chicago, Illinois. The local claimed jurisdiction over all taxi drivers in the city of Chicago. Its officers consisted of a president, vice president, secretary-treasurer, recording secretary, and three trustees. During the early period of petitioner's employment with local 777 he held the position of assistant business agent. Commencing sometime in 1952 and continuing thereafter to February 3, 1958, he was a trustee of the local. On February 3, 1958, he became president, which position he now holds. Throughout the period in question petitioner held no position with any labor union other than with local 777. Sometime subsequent to becoming trustee of local 777, by virtue thereof, he became a member of Joint Teamsters Council No. 25. On October 7, 1954, petitioner and four others were indicated by a Federal Grand Jury at Chicago for alleged acts in violation of the so-called Hobbs or Anti-Racketeering Act (Section 1951, Title 18, United States Code). The indictment charged, in part, *141 that commencing on or about March 1944 and continuing thereafter to and until the date of the indictment, petitioner did willfully and feloniously combine, conspire, and agree with his codefendants and certain named coconspirators to obstruct, delay, and affect interestate commerce between the several states of the United States, and the movement of live poultry, including chickens, ducks, turkeys, and other fowls, by extortion, to wit, obtaining money and property from poultry merchants and their agents through wrongful use of actual and threatened force, violence, and fear. The indictment further charged that as a part of the conspiracy petitioner collected some of the moneys which had been given with the consent of the poultry merchants, induced by the wrongful use on the part of the defendants of actual and threatened force, violence, and fear; that the defendants instilled and implanted in the minds of the poultry merchants fear that if defendants' demands for money were not complied with, personal physical violence would result to the merchants and economic loss as a result of labor stoppages, slowdowns, wrongful strikes, and property damage to their places of business and *142 equipment. Local 777 was not a party defendant in the criminal proceeding against the petitioner; it was not named as a defendant in the indictment, nor was it separately charged with any criminal offense. The indictment contained no charge against petitioner with respect to any acts in connection with his employment at local 777. Petitioner entered a plea of not guilty to the charge in the indictment and he was tried by a jury in Federal District Court at Chicago, beginning March 15, 1957. The trial concluded on March 25, 1957, and the jury found petitioner not guilty of the charge in the indictment. On October 4, 1954, 3 days prior to the return of the indictment against petitioner, the membership of local 777 held its regular monthly meeting. The minutes of that meeting state, in part, as follows: Brother Joseph Coca opened the meeting and then turned the Chair over to Bro. Geo. Marcie. Bro. Marcie spoke on the fact that our union has received considerable unfavorable publicity by the press. * * * As a result of these write-ups the executive board immediately asked for an audit of the books of the union to show that these attacks were strictly the imagination of some reporters *143 who probably were instructed to paint it up good, which they did. * * * He then brought out that instead of him telling about answering these attacks he thought it would be better if he turned over the floor to the members so that they could ask questions on any particular article that they read especially those regarding Brother Glimco. This was agreed on and before the first member took the floor, Bro. Marcie brought out the fact that he thought these attacks would continue and if this trial by newspaper kept on that we, the officers of this union, would have to defend ourselves both by ads and by legal counsel. * * * Brother Marcie brought out the fact that the audit has shown that there is over $750,000 in cash in the banks, and the membership was very gratified to hear this fact. As soon as Bro. Marcie brought this out, Bro. Winnick asked for the floor and that as a member of long standing that he had nothing but good things done for him while a member of this union and that he believed that all members must stick with and uphold their unions, and that there was no point in asking a lot of questions and turning our meeting into a question and answer program. Bro. Winnick then *144 made a motion that the local union take care of their officers and legal fees, and give the entire executive board a vote of confidence so that they could continue the good work that has been done by the executive board. Seconded by Bro. Ruggiero and after a lengthy discussion in which there was just one member dissenting the motion was passed unanimously. * * * On April 1, 1957, subsequent to the conclusion of the criminal proceedings, the membership of local 777 held a regular meeting. The minutes of that meeting state, in part, as follows: Bro. Glimco asked for the floor and thanked the rank and file for all support give him during his trial. Bro. Chernin then took the floor and called for a motion to reaffirm the position taken to support Bro. Glimco when these anti labor proceedings were started, and to approve all action taken in his defense by the local executive board and officers since the beginning of the public attack upon our union and its officers in the fall of 1954. The above motion was seconded by Bro. Siewert and was unanimously carried. * * * The services of attorneys were obtained by the local for the defense of petitioner upon the charges contained in the *145 criminal indictment and such services were acquiesced in and accepted by petitioner. Fees and expenses pertaining to the defense of petitioner were paid by local 777 in the years and amounts as follows: Year
Amount
1954
$35,250.00
1955
34,125.92
1956
33,800.45
1957
21,445.08
None of the payments in question were made to or through the petitioner; the local paid the various lawyers who worked on the case for their fees and expenses directly by its checks. Petitioner did not report any of the amounts paid by local 777 to his lawyers and others as income in his income tax returns for any year. For many years the Chicago poultry dealers have concentrated within a certain section of Chicago. Most of the employees of the poultry merchants are members of the Poultry Handlers Union, local 650, an affiliate of the AFL-CIO. Between on or about June 1937 and on or about January 1939 petitioner was employed by local 650 as an organizer. In addition to the Poultry Handlers Union, various Teamster locals also operate on the market due to the fact that a good deal of the poultry moves into and out of the market by truck. Petitioner reported no income as a *146 result of his activities on the Chicago Poultry Market during the years 1944 through 1954. Joint Teamsters Council No. 25 is composed of all Teamster locals in the city of Chicago. During the years in question there were approximately 42 such locals in Chicago. The seven officers of each local constituted the local's delegates to the Joint Council. During the years in question local 777 was a member of the Joint Council and petitioner became a delegate to the Joint Council by virtue of the fact that he was made a trustee of the local. Ultimate Findings The payments by local 777 of the attorney fees and expenses of petitioner's defense upon the charges contained in the indictment referred to above were made because of expected benefit to the local as a part of organized labor and not from a disinterested sense of generosity toward petitioner. In carrying on his poultry market activities, petitioner was not engaged in a trade or business for profit. Opinion Petitioners here make the primary contention that the expenses and attorney fees connected with petitioner's defense upon an indictment charging him with a criminal conspiracy which were directly paid by the local union *147 of which he was an officeremployee constituted gifts to him by the local. We find that the payment of such expense by the local union was not motivated by a sense of detached and disinterested generosity on its part, Commissioner v. Duberstein, 363 U.S. 278, or out of affection, respect, admiration, charity, or like impulses, Mary B. Heyward, 36 T.C. 739. On the contrary, it is clear from the record that the local was motivated by the feeling that the labor movement generally was under attack by the press through sought-for indictment of its officials and that indictment, and particularly trial and conviction of petitioner as such an official, would work a harm upon labor generally and petitioner's local union itself. Clearly the local resolved to pay these expenses because it wished to benefit by mitigation or avoidance of this harm. Because the local union thus may not be said to have had a donative intent, we find no gift was made in the payment of the involved expenses. Petitioner, however, has taken the alternative position that should we hold as above, then such expenses, even though income to petitioner when paid by his employer, constitute deductible *148 ordinary and necessary business expense under Section 162(a), Internal Revenue Code of 1954. [1] He relies heavily upon Commissioner v. Tellier, 383 U.S. 687, affirming 342 F. 2d 690 (C.A. 2), which had reversed a Memorandum Opinion of this Court. We find Commissioner v. Tellier, supra, to be distinguishable from this case on the facts. In Tellier, supra, there was no question but what the expenses of defense of the criminal charge there in question would constitute business expense. The only issues decided were that they also were ordinary and necessary to the conduct of the taxpayer's business and that the argument of the Commissioner that the allowance of such expenses as a deduction would be contrary to well-defined public policy was to no avail. This case, on the other hand, presents the immediate question whether the expenses paid to defend petitioner upon the indictment for conspiracy *149 to extort money were in any way connected with his business. The record discloses no business activity on the part of petitioner other than that of officer-employee of local 777, Taxicab Drivers, Maintenance and Garage Helpers Union. This, together with activity resulting in amounts received as salary from the local, salary from the local's Health and Welfare Fund, and salary from Automatic Phonograph Distributing Co., constituted his only activity shown by the evidence to have had a profit-making objective. We are not shown what those activities are with the exception of the former. The record does disclose that petitioner spent generally until noon attending to the business of local 777 and that thereafter he spent the remainder of each day at a restaurant in the poultry-market area of Chicago where he discussed labor matters with various market dealers and others interested in poultrymarket operations. Petitioner's own testimony makes it clear that these discussions were carried on by him not as an officer of local 777, but as a "labor boss" who had influence with the Teamsters Union. We cannot find from any evidence before us that the latter activities had any bearing upon petitioner's *150 duties as an officer-employee of local 777 which was a union representing the interests of taxicab operators. We also have no evidence which indicates petitioner at any time acted as "labor boss" with any idea in mind of being compensated for such activities. Indeed, there is no showing here but that such activities were carried on other than for his personal aggrandizement. He certainly had no employer who required such activities of him. The charges upon which he was tried and acquitted grew out of his activities as "labor boss," not from his labors as officer-employee of local 777 which paid the expenses here in question. Cf. Frank J. Matula, 40 T.C. 914; Irving Sachs, 32 T.C. 815, affd., 277 F. 2d 879 (C.A. 8), certiorari denied 364 U.S. 833. On this issue also we find for respondent. Issue 2 Findings of Fact Petitioners reported on their 1956 return a long-term capital gain of $796.25 from the sale of property located at 1215 Oak Park Ave., Chicago, Illinois, as follows: 1953 purchase price
$39,050.00
1956 sold for
$40,000.00
Less: Expenses
153.75
39,846.25
Long-term capital gain
796.25
*151 Respondent determined that the cost basis of the property was $30,901.60 and, accordingly, increased the long-term capital gain as reported by the amount of $8,148.40. Ultimate Finding The cost basis of the property in question was $30,901.60. Opinion In 1967 the hearing of this issue was held. Petitioner, on cross-examination, has stated unequivocally that his memory is extremely poor. The evidence he had offered in support of his contention that the proper cost basis for the property sold is $39,050 is meager to the extreme and entirely insufficient to overcome the presumption that respondent's determination is correct. * Such testimony as he gave is inconsistent with his professed poor memory in that the events concerned occurred in 1956 and prior thereto yet, without written record of them, he now recalls exact amounts of cash payments made by him to specific payees and the reasons for each payment. He has offered no proof at all regarding the kind of property involved in order that a finding can be made as to its depreciability. He has failed to substantiate his oral testimony regarding payments made in cash for improvements made upon the property. Where the record *152 indicates the availability of substantiating evidence, such as the testimony of payees or at least the receipts which would, in the ordinary course of business, have been obtained for such cash payments as were testified to, and the absence of such testimony or evidence is unexplained, we must conclude that the same is either nonexistent or, if produced, would have failed to support petitioner's oral testimony. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165, affirmed, 162 F. 2d 513 (C.A. 10); W. A. Shaw, 27 T.C. 561, 573, affirmed, 252 F. 2d 681 (C.A. 6). We do not believe petitioner's oral testimony with respect to the cash payments made and therefore find that he has failed to sustain the burden of proof resting upon him. He has shown no greater basis for the property in question than that determined by respondent and for that reason we find for respondent on this issue. Issue 3 Findings of Fact In his amended answer, respondent has indicated that a portion of the unreported income referred to in his notice of deficiencies consists *153 of dividend income from American Telephone and Telegraph Company stock in the amount of $244.75 for 1956 and $319.00 for 1957. Petitioner's reply makes denial of this allegation. Ultimate Findings In the taxable year 1956 petitioners had unreported dividend income of $244.75 and for 1957, $319.00. Opinion We again find that petitioner has failed to produce sufficient evidence to overcome the presumption of correctness of responent's determination on the issue presented. We do have his oral, but unsubstantiated, testimony that neither he nor his wife owned the stock upon which respondent has determined petitioners received dividends. This testimony is not supported by either that of his wife or the children whom he contends actually held title to the stock. No stock certificates were produced which might so indicate and no evidence is offered which would indicate the names of titleholders upon the books of the issuing corporation. The absence of such testimony and evidence being unexplained on this record we must again conclude that, when produced, it would fail to support petitioner's position. For failure on the part of petitioners to sustain their burden of proof, we also *154 find for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩
*. By order of Tax Court, dated June 9, 1967, "correct" was substituted for "in error".↩